**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**


DEVELOPERS SURETY AND INDEMNITY )
COMPANY and SELECTIVE INSURANCE )
COMPANY OF AMERICA, )
                          )
        Plaintiffs, )
                          )
   v. )        1:11CV515
                          )
CITY OF DURHAM, NORTH CAROLINA, )
                          )
                          )
        Defendant, )
                          )
   v. )
                          )
SHERRON ROAD VENTURES LLC, )
DURHAM LAND ASSOCIATES, LLC, )
SUSAN R. WHITEHEAD, JERRY A. )
RADMAN, and ELIZABETH G. RADMAN,)
                          )
        Third-Party )
        Defendants. )


## MEMORANDUM OPINION AND ORDER

This case comes before the Court on: (1) Selective Insurance Company of America's Motion for Summary Judgment (Docket Entry 41); (2) Developers Surety and Indemnity Company's Motion for Summary Judgment (Docket Entry 43); (3) Defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Docket Entry 44); (4) Plaintiff's Objections to Evidence Submitted by Defendant in Support of Defendant's Motion for Summary Judgment (Docket Entry 59); (2) Plaintiffs' Objections to Evidence Submitted by Defendant in Support of Defendant's Response Briefs (Docket Entry 66);.[1] For

---

[1] The Parties consented to disposition of this case by a Magistrate Judge pursuant to 28 U.S.C. § 636(c). (See Docket Entry
(continued...)

the reasons that follow, the Court will grant in part and deny in part Plaintiffs' summary judgment motions, will deny Defendant's summary judgment motion, and will deny as moot Plaintiffs' evidentiary-related motions.

BACKGROUND

The instant action arises out of a dispute regarding Plaintiffs' obligations under bonds that they issued in connection with subdivision developments in Durham, North Carolina. Plaintiffs Developers Surety and Indemnity Company ("Developers Surety") and Selective Insurance Company of America ("Selective") are surety companies authorized to write bonds in the state of North Carolina. (See Docket Entry 1, ¶¶ 1-2.) Sherron Road Ventures, LLC ("Sherron Road") and Durham Land Associates, LLC ("Durham Land"),[2] both owned and controlled by MacGregor Development Company ("MacGregor"), were the developers of subdivisions Ravenstone and Stonehill Estates (the "Subdivisions"), respectively. (See id., ¶¶ 4-6.) Upon agreement with the City of Durham (the "City"), in connection with the development of the Subdivisions, the Developers were to construct certain infrastructure improvements, such as sidewalks and streets, and were to implement certain stormwater facilities, such as detention ponds, within the Subdivisions. (See id., ¶¶ 13-14.)

_____

[1](...continued)
12 at 3; see also Docket Entry 15 (order referring case to a Magistrate Judge pursuant to 28 U.S.C. § 636(c)).)

[2] This Memorandum Opinion will refer to Sherron Road and Durham Land collectively as the "Developers."

Section 6O(1) of the City Ordinance in effect at the time of the development of the Subdivisions (the "Old Zoning Ordinance") provided that "no Certificates of Occupancy or Compliance shall be issued and no permanent individual water or sewer services provided until all required improvements have been completed or until an acceptable performance guarantee, sufficient to insure completion of all required improvements, has been filed with the City or County, as appropriate." (Docket Entry 1-1 at 1.)[3] With respect to the form of such performance guarantee, the Old Zoning Ordinance expounded that "[s]uch guarantee may be in the form of a surety bond, letter-of-credit, or some other surety instrument acceptable to the City or County . . . [and] shall be conditioned upon the performance of all work necessary to complete the specified improvements and the delivery of all necessary encroachment agreements, with said performance and delivery to be done within a stipulated time period." (Id.) Moreover, per the Old Zoning Ordinance, "[t]he required amount of the guarantee shall be as determined by the City or County and shall allow for administrative costs, inflation, and other contingencies." (Id. at 1-2.)

Because the Developers desired to sell certain homes or lots within the Subdivisions before the completion of the agreed-upon infrastructure and stormwater facilities, they sought to comply with the Old Zoning Ordinance by causing Plaintiffs, as sureties,

---

[3] "[T]he City replaced the Old Zoning Ordinance in 2006, with the City's Unified Development Ordinance (the 'UDO')." (Docket Entry 42 at 6.)

-3-

to execute surety bonds for the Subdivisions naming the City as the obligee. (Docket Entry 1, ¶ 20.) Specifically, Selective, through its agent TriSure Corporation ("TriSure"), issued the following seven bonds for certain sidewalk and final street asphalt work in the Subdivisions: B720185, B720188, B720377, B720183, B720187, B720376, and B720388; the following five bonds for maintenance of certain stormwater ponds in the Subdivisions: B720078, B720079, B720080, B720386, and B720181; and the following two bonds for conversion/construction of certain stormwater ponds in the Stonehill Estates Subdivision: B720378 and B720379. (Id., ¶¶ 21-24; see also Docket Entry 48-1.) Developers Surety, also through its agent TriSure, issued the following five bonds for certain sidewalk and final street asphalt work in the Subdivisions: 593637, 593640, 580036S, 593636, and 593638. (Docket Entry 1, ¶¶ 25-26; see also Docket Entry 48-2.)[4] Each of the foregoing bonds falls into one of three categories: (1) bonds addressing the sidewalks and street asphalt in the Subdivisions (the "Street and Sidewalk

---

[4] A discrepancy exists between the Bonds listed in the Complaint (see Docket Entry 1, ¶¶ 21-26), the Bonds that Plaintiffs address in their summary judgment motions (see Docket Entries 41, 43), and the Bonds referenced in the Parties' respective summaries of the Bonds (see Docket Entries 48-1, 48-2, 44). Specifically, the Complaint lists Bond No. B720077 (see Docket Entry 1, ¶ 23), which does not appear in Plaintiffs' summary judgment motions or supporting briefs (see Docket Entries 41, 42, 43, 46) or any of the Parties' summaries of the Bonds at issue (see Docket Entries 48-1, 48-2, 44 at 3-4); and Bond No. B720379 appears in the Parties' summaries of the Bonds (see Docket Entries 48-1 at 1; Docket Entry 44 at 4 (in an amount combined with Bond No. B720080)), but does not appear in the Complaint (see Docket Entry 1). The Court accepts those Bonds which the Parties have included in their summaries (Docket Entries 48-1, 48-2, 44 at 3-4) as an accurate accounting of the Bonds at issue.

-4-

Bonds"); (2) bonds explicitly referring to the operation and maintenance of stormwater facilities in the Subdivisions (the "Stormwater Maintenance Bonds"); and (3) bonds addressing the construction or "conversion" of stormwater facilities in the Subdivisions (the "Stormwater Construction Bonds").

The Street and Sidewalk Bonds, with the exception of Bond Nos. B720376 and 580036S, contain language akin to the following:

> For the completion of approximately [] linear feet of five foot wide concrete sidewalk and the final asphalt for street acceptance for [Subdivision phase].

(See Docket Entries 48-3, 48-6, 48-12, 48-16, 48-17, 48-18, 48-30, 48-33, 48-36, 48-39.)  Of the two Street and Sidewalk Bonds with notable differences, Bond No. 580036S omits the phrase "for street acceptance" (Docket Entry 48-27 at 1), and Bond No. B720376 reads:

> For completion of utility adjustments, the final asphalt and approximately 3000 foot concrete sidewalk and handicapped ramps for street acceptance for Phase 2 section 1 to Ravenstone Subdivision.

(Docket Entry 48-9 at 1 (emphasis added).)

With respect to the Stormwater Maintenance Bonds, each contains language substantially similar to the following:

> THE CONDITION OF THIS OBLIGATION IS SUCH, that whereas the Principal has entered into a Stormwater Facility Agreement and Covenant Version 082203 for a stormwater facility (facilities) located at [Subdivision phase and pond reference]; and the Principal has agreed to operate and to maintain this facility in perpetuity, and has agreed to provide surety for the perpetual operation and maintenance; and whereas, the City is willing to allow the Principal to file a bond with it to guarantee that the stormwater facility is operated and maintained in accordance with the Agreement; now, therefore, the Principal will operate and maintain the stormwater facilities in perpetuity in accordance with the Agreement.

(Docket Entry 48-21 at 1; <u>see also</u> Docket Entry 48-15 at 1; Docket Entry 48-23 at 1; Docket Entry 48-25 at 1; Docket Entry 48-26 at 1.)  Finally, the Stormwater Construction Bonds state that they cover "conversion of the ponds from sediment and erosion contral [sic] ponds into permanent facilities." (Docket Entry 48-22 at 1; <u>see also</u> Docket Entry 48-24 at 1.)

The City dictated the language contained in the Bonds. (<u>See</u> Docket Entry 45 at 6.)  That is, the City supplied the bond form, and "TriSure[] would complete the bond form supplied by the City by inserting the penal sum and the underwritten obligation language supplied by the City." (<u>Id.</u> (citing Docket Entry 44-9 at 16).) Moreover, as the City's brief in support of its summary judgment motion describes, Plaintiffs and their agent TriSure accepted the language provided by the City without further inquiry:

> Heidi O'Connor, agent with TriSure, who processed the bonds for both [Plaintiffs], testified in her deposition that in processing the bonds at issue in this case she engaged in no analysis of the scope of the underwritten obligations and she demonstrated through her testimony an inability to interpret the bond language.  Similarly, Andrea Vallandingham, senior underwriter with Selective, testified that in underwriting the Selective bonds she performed no analysis of the scope of the underwritten obligation.  [Plaintiffs] and their agent, TriSure, did not have or consider the Durham Code of Ordinances, the City's former land use ordinance, the City's current Unified Development Ordinance, the City's subdivision requirements, City development review standards, City standards and specifications, the City's Best Management Practices for Stormwater Manual, or any of the applicable stormwater facility agreements when it issued bonds at issue in this case.

(<u>Id.</u> at 6-7 (internal citations omitted).)  Thus, the City bears sole responsibility for the Bonds' language and penal sums.

The City calculated the penal sum for each of the Bonds according to pre-determined standards. With respect to the Street and Sidewalk Bonds, City employee Albius Mufalo "would . . . determin[e] the linear feet of sidewalk needed and multiply[] this number by a cost per linear foot, and [] determin[e] the number of tons of final asphalt needed and multiply[] this number by a cost per ton." (Docket Entry 46 at 5; see also Docket Entry 48-69 at 16.) Mr. Mufalo understood that the per-ton price of asphalt accounted for "associated items" to the laying of the final inch of asphalt, but admitted that he was "given the rate" by his manager and was not aware of the "breakdown" of the per-ton price. (Docket Entry 48-69 at 15.) For the Stormwater Construction Bonds, the penal sum was "based upon the City's estimate of the stormwater-facility construction cost." (Docket Entry 42 at 8 (citing Docket Entry 48-68 at 7, 12).) Finally, as to the Stormwater Maintenance Bonds, "[t]he City determined the average annual maintenance cost and multiplied this cost by 20 to determine the amount of the . . . Bonds." (Docket Entry 42 at 13 (citing Docket Entry 48-48).)

The parent company of the Developers filed for bankruptcy on November 14, 2008 (see Docket Entry 45 at 9 (citing In re MacGregor Dev. Co., No. 8:09-bk-8089 (Bankr. E.D.N.C.))) and the Developers ceased work in the Subdivisions before completing all of the infrastructure relevant to the Bonds. Then, according to the City,

> [i]n Spring 2011, with the required infrastructure still not complete, the City proceeded to prepare detailed estimates of the cost to the City to complete the streets in conformance with the approved Construction Drawing and City Requirements. The City also determined the cost to

-7-

complete the required stormwater facilities in
conformance with the approved Construction Drawings and
City Requirements. After formulation of the
aforementioned completion cost estimates, the City,
through the City Attorney's Office, made demands on
Plaintiffs to pay the City's estimated cost to complete,
up to the penal sum of the applicable subdivision bonds.
Plaintiffs responded by filing their Complaint.

(Id. at 9-10 (internal citations omitted).)

Plaintiffs now ask the Court to hold as a matter of law that:

(1)    the scope of work under the Street and Sidewalk Bonds is

limited to "(i) installing incomplete sidewalk segments,

if any, and (ii) applying the final one-inch layer of

asphalt on the streets to which final asphalt has not yet

been applied, with the cost to complete sidewalks and

final asphalt calculated as of one year from the date of

each [Street and Sidewalk] Bond" (Docket Entry 41, ¶ 1;

accord Docket Entry 43, ¶ 1);

(2)    "the penal sum of [Selective's Street and Sidewalk] Bond

for Ravenstone, Phase 2, Section 1 (Bond No. B720376) has

been reduced to $45,000" (Docket Entry 41, ¶ 3);

(3)    "[t]he scope of work under each of Selective's five

[Stormwater Maintenance Bonds] is limited to producing

security for costs of operating and maintaining already-

constructed and fully converted stormwater facilities and

does not include any costs to construct, complete, or

convert stormwater facilities" (id., ¶ 4); and

(4)    "should the Court rule that the scope of work required

under the [Stormwater Maintenance] Bonds includes costs

-8-

to construct, complete, or convert stormwater facilities, the penal sum of Selective's [Stormwater Maintenance] Bond for the Ravenstone Wetland stormwater facily (Bond No. B720181) should be reduced by $100,000 due to the City's failure to maintain a $100,000 letter of credit that had been issued for constructing the wetland facility" (id., ¶ 5).[5]

Conversely, the City seeks an order imposing more expansive liability upon Plaintiffs. (See Docket Entry 7 at 17-18.) The Parties' primary disputes generally devolve to the following two issues: (1) whether the Street and Sidewalk Bonds relate to all work required to complete the streets for street acceptance or merely final asphalt; and (2) whether the Stormwater Maintenance Bonds cover construction of stormwater facilities or only operation and maintenance of already-constructed facilities. (See Docket Entry 42 at 7; Docket Entry 45 at 13-18; Docket Entry 46 at 9.)[6] Based upon the resolution of those two issues, the Court must address certain arguments regarding valuation.[7]

---

[5] Selective also requested that the Court declare Bond No. B720183 discharged (see Docket Entry 41, ¶ 2) and Developers Surety asked the Court to rule Bond No. 580036S discharged. (See Docket Entry 43, ¶ 2.) The City has conceded those points. (Docket Entry 51 at 2 ("Developers Surety's obligations under street bond No. 580036S have been satisfied."); Docket Entry 54 at 2 ("Selective's obligations under street bond No. B720183 have been satisfied.").)

[6] "Sidewalks are generally not at issue, because they have been installed and accepted." (Docket Entry 46 at 6.)

[7] The City argues for a certain amount owed under the Bonds should the Court decide the scope of the Bonds in its favor. (See
(continued...)

-9-

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Such a genuine dispute exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). In making this determination, the Court must view the evidence and any reasonable inferences therefrom in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The party moving for summary judgment may discharge its burden by identifying an absence of evidence to support the non-moving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The non-moving party then must "set forth specific facts showing that there is a *genuine issue for trial*." Matsushita Elec. Indus., 475 U.S. at 586–87 (citation omitted) (emphasis in original). In this regard, the non-moving party must convince the Court that evidence exists upon which a finder of fact could properly return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 252 (citation omitted); see also Francis v.

---

[7](...continued)
Docket Entry 44 at 4.) Plaintiffs do not address a cumulative sum owed under the Bonds should the Court find in their favor, but do make certain specific arguments regarding reductions in the penal sums of certain Bonds as well as an argument regarding the time period for determining the value of the Bonds. (See Docket Entry 41, ¶¶ 1,3, 5; Docket Entry 43, ¶¶ 1, 3; Docket Entry 46 at 20.)

Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

To the extent the Court must draw conclusions about matters of North Carolina law in evaluating summary judgment issues,[8] "the highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted." West v. American Tel. & Tel. Co., 311 U.S. 223, 236 (1940). However, "[a] state is not without law save as its highest court has declared it. There are many rules of decision commonly accepted and acted upon by the bar and inferior courts which are nevertheless laws of the state although the highest court of the state has never passed upon them." Id.

Accordingly, "it is the duty of [a federal court facing a question of state law] to ascertain from all the available data what the state law is and apply it . . . ." Id. at 237. "Where an intermediate appellate state court rests its considered judgment

---

[8] The Parties appear to agree that North Carolina law governs interpretation of the Bonds at issue. (See Docket Entry 42 at 7; Docket Entry 45 at 10-11; Docket Entry 46 at 10.) Moreover, given, as the City notes, that "[t]he bonds were issued and administered in North Carolina, and the work governed by the bonds occurred in Durham, North Carolina" (Docket Entry 45 at 10), the Court has no reason to dispute that conclusion. See Tanglewood Land Co. Inc. v. Byrd, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980) ("[T]he interpretation of a contract is governed by the law of the place where the contract is made.").

upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." Id.

As it relates to the instant case, "under North Carolina law . . . , 'a public performance bond is a contract, governed by the law of contract. Parties entering into public performance bond[s] are free to contract for any terms they so desire.'" County of Brunswick v. Lexon Ins. Co., 425 F. App'x 190, 192 (4th Cir. 2011) (quoting Town of Pineville v. Atkinson/Dyer/Watson, Architects P.A., 114 N.C. App. 497, 442 S.E.2d 73, 74 (1994)); see also Rutherford Cnty. v. Bond Safeguard Ins. Co., No. 1:09cv292, 2011 WL 809821, at *6 (W.D.N.C. Mar. 2, 2011) (unpublished) ("Surety bonds are construed under the common law of contracts."). Further,

> "[i]t is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument. When the language of the contract is clear and unambiguous, construction of the agreement is a matter of law for the court and the court cannot look beyond the terms of the contract to determine the intentions of the parties. However, extrinsic evidence may be consulted when the plain language of the contract is ambiguous. Whether or not the language of a contract is ambiguous is a question for the court to determine. In making this determination, words are to be given their usual and ordinary meaning and all the terms of the agreement are to be reconciled if possible."

Stovall v. Stovall, 205 N.C. App. 405, 410, 698 S.E.2d 680, 684 (2010) (quoting Lynn v. Lynn, 202 N.C. App. 423, 431-32, 689 S.E.2d 198, 204-05 (2010)).

DISCUSSION

A. Street and Sidewalk Bonds

In Selective's words: "The Parties disagree on the [Street and Sidewalk] Bonds' scope of work. The Sureties state that the [Street and Sidewalk] Bonds cover only unconstructed sidewalk segments, if any exist, and the final one-inch of asphalt. The City states [said] Bonds cover everything needed for a street to be formally accepted by City Council for maintenance by the City." (Docket Entry 46 at 11.) According to the City: "[T]he obligations of the Developers and Plaintiffs pursuant to the [S]treet [and Sidewalk] [B]onds includes all necessary preparation and repair of the street subgrade and contiguous street elements before placing the final street asphalt in order to complete the streets in conformance with the approved Construction Drawings and City Requirements." (Docket Entry 45 at 13-14.)

As noted in the Background section, the Street and Sidewalk Bonds generally use the same basic language. Following the prompt "[the] City is willing to allow the Principal to file a bond with it to guarantee the making of those improvements, now, therefore, the Principal will, by (date) _____, do the following (identify contract to be fulfilled or actions to be taken)," they state:

> For the completion of approximately [] linear feet of five foot wide concrete sidewalk and the final asphalt for street acceptance for [Subdivision phase].

(Docket Entries 48-3, 48-6, 48-12, 48-16, 48-17, 48-18, 48-30, 48-33, 48-36, 48-39.)[9]  A plain reading of the Street and Sidewalk Bonds' language supports Plaintiffs' position, i.e., the Street and Sidewalk Bonds specifically address the completion of a certain amount of unconstructed sidewalk and "final asphalt" but lack any language that the Court can construe as expanding that scope.

The City argues that:  (1) the terms agreed to by the Developers reflect that the Street and Sidewalk Bonds cover all work necessary to complete the planned infrastructure (Docket Entry 45 at 13-14); (2) "[t]he scope of the obligation(s) of the Plaintiffs under the [S]treet [and Sidewalk] [B]onds is measured by the agreements of the Developers to complete the improvement(s) identified in [said] [B]onds in accordance with all applicable City requirements" (id. at 15); and (3) the inclusion of the phrase "for street acceptance" obliges Plaintiff to perform all work required to meet the standard for "street acceptance" (id. at 15-16).[10]

---

[9] The Parties do not dispute the meaning of the term "final asphalt."  Mr. Mufalo, the City's Civil Engineer responsible for dictating the language used in the Bonds, confirmed that "final asphalt" refers to the "one-inch top coat of asphalt":

> Q:   And final asphalt is the one-inch top coat of asphalt, correct?
>
> A:   Yes, sir.

(Docket Entry 48-69 at 6.)  In addition, the City's expert acknowledges that "final asphalt" represents a separate concept from repairing subgrade, utility work, and repairing curbs.  (See Docket Entry 48-67 at 14-15.)

[10] The City's briefs responding to Defendants' summary judgment motions incorporate arguments presented in the City's brief in
(continued...)

Although the City sets forth the first two of these arguments in separate sections of its brief, they appear to offer the same basic contention - i.e., that the scope of work to which the Bonds obligated Plaintiffs equals the scope of work to which the Developers agreed. Specifically, the City argues that, because "[t]he Developers were obligated to complete the planned roadway improvements prior to issuance of certificate[s] of occupancy in a manner that will allow them to function as noted on the plan and in accordance with [North Carolina Department of Transportation] and City of Durham standards and polices" (id. at 13-14 (quotation marks omitted)) and because "the [Street and Sidewalk Bonds] stated that the principal has applied to the City for final approval of the identified development" (id. at 14), "[t]he [Street and Sidewalk Bonds] issued by Plaintiffs obligated [] Plaintiffs to complete the portions of dedicated rights-of-way referenced in the [B]onds in conformance with the approved Construction Drawings and City Requirements if their principals did not" (id. at 13). This argument lacks merit. The Developers' obligation to complete the streets and sidewalks in accordance with City standards does not change the language of the Street and Sidewalk Bonds, particularly the specific language more narrowly defining their scope.[11]

------

[10] (...continued)
support of its own summary judgment motion. (See Docket Entry 51, ¶¶ 1, 5; Docket Entry 54, ¶¶ 1, 4, 6.)

[11] In addition, to the extent the City argues that the Bonds must cover additional actions because the "'final asphalt layer can only be placed after the existing subgrade and asphalt failures are (continued...)

In support of a contrary conclusion, the City cites RGK, Inc. v. United States Fid. & Guar. Co., 292 N.C. 668, 684, 235 S.E.2d 234, 244 (1977), for its statement that the "obligation of the bond is to be read in light of the contract it is given to secure. The extent of the engagement entered into by the surety is to be measured by the terms of the principal's agreement." Similarly, the City points to the language in Carolina Builders Corp. v. New Amsterdam Cas. Co., 236 N.C. 513, 515, 73 S.E.2d 155, 156 (1952), that "[t]he extent of the engagement entered into by the surety is to be measured by the terms of the principal's agreement." In the instant case, however, no contract between the City and the Developers regarding the construction of the streets exists. Moreover, even if a contract did exist, the authority cited by the City does not establish that any such related contract should control the Parties' obligations where Plaintiffs and the City agreed to bond language with an explicit scope.

In addition, the Court cannot interpret the phrase "for street acceptance" to mean that the Street and Sidewalk Bonds address all items necessary for acceptance by the City. Simply put, the plain language of said Bonds shows that Plaintiffs must complete only the sidewalks and the final asphalt in a manner sufficient for street acceptance. To agree with the City's interpretation would require

_____

[11](...continued)
corrected per City Standards,'" (Docket Entry 45 at 15 (quoting "Joyner Aff. ¶ 13")), such argument fails for the same reason, i.e., the language of the Bonds refers only to the "final asphalt" and not the steps preceding its application.

more than the "liberal interpretation" of the Street and Sidewalk Bonds that the City urges (see Docket Entry 45 at 13), but, rather, a judicial rewriting of the Parties' obligations.  Where, as here, the bond form (which the City provided) contains language (which the City dictated) unambiguously reflecting that Plaintiffs must pay only for incomplete sidewalk and "final asphalt," the Court cannot now rewrite that language to include the phrase "and all other necessary items" as the City desires.[12]

## B. Stormwater Maintenance Bonds

"Selective contends that only the [Stormwater] Construction Bonds cover the completion of the stormwater facilities.  The City, however, contends that the [Stormwater Maintenance] Bonds are not simply maintenance bonds, but they also cover the completion of stormwater facilities and has demanded payment from the [Stormwater Maintenance] Bonds to cover completion costs."  (Docket Entry 42 at 4.)  In addition to the language of Section 6O(1), the Old Zoning Ordinance provides in relevant part that no certificates of occupancy or compliance shall issue until:

> "[t]he property owner has posted a performance bond or other surety instrument satisfactory to the City of Durham or Durham County, as appropriate, in an amount determined by the Durham City Engineer to assure maintenance, repair, or reconstruction necessary for

---

[12] Given that the Court finds the Street and Sidewalk Bonds clear and unambiguous on their face, evidence of the Parties' subjective intent and/or understanding does not impact the analysis.  See Bueltel v. Lumber Mut. Ins. Co., 134 N.C. App. 626, 631, 518 S.E.2d 205, 209 (1990) ("'If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract.'" (quoting Walton v. City of Raleigh, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996))).

adequate performance of the engineered stormwater controls."

(Id. at 5 (quoting Docket Entry 48-42 at 1).) That subsection also requires the property owner to execute an Operation and Maintenance Agreement, which here took the form of the Stormwater Facility Agreement. (Id.; see also Docket Entry 44-5 at 20.)

Each of the Stormwater Maintenance Bonds contains language substantially similar to the following:

> THE CONDITION OF THIS OBLIGATION IS SUCH, that whereas the Principal has entered into a Stormwater Facility Agreement and Covenant Version 082203 for a stormwater facility (facilities) located at [Subdivision phase and pond reference]; and the Principal has agreed to operate and to maintain this facility in perpetuity, and has agreed to provide surety for the perpetual operation and maintenance; and whereas, the City is willing to allow the Principal to file a bond with it to guarantee that the stormwater facility is operated and maintained in accordance with the Agreement; now, therefore, the Principal will operate and maintain the stormwater facilities in perpetuity in accordance with the Agreement.

(Docket Entry 48-21 at 1 (emphasis added); see also Docket Entry 48-15 at 1; Docket Entry 48-23 at 1; Docket Entry 48-25 at 1; Docket Entry 48-26 at 1.) The plain language of the Stormwater Maintenance Bonds supports Plaintiffs' position in that it refers repeatedly to a duty to "operate and maintain" the stormwater facilities, but lacks any reference to construction or conversion.

Despite that clear language, the City contends Plaintiffs' obligations mirror the Developers' obligations under the Stormwater Facility Agreements. (See Docket Entry 45 at 18.) In that regard, the City notes that the Stormwater Facility Agreements required the Developers to, in pertinent part, "[c]onstruct the Facility in

accordance with the plans approved by the Director of Public Works." (Docket Entry 45 at 18 (quoting Docket Entry 44-5 at 20).)[13] The City's argument on this point fails for the same reason as did its contentions regarding the Street and Sidewalk Bonds - i.e., the unambiguous language of the Bonds does not allow for such an interpretation. To the extent the Stormwater Maintenance Bonds incorporate the obligations of the Stormwater Facility Agreements, they clearly limit those obligations to operation and maintenance, as evidenced by their repeated use of that terminology. In fact, a bond could not more clearly express its purpose than to state, as these Bonds do, that it "guarantee[s] that the stormwater facility is operated and maintained in accordance with the Agreement." (Docket Entry 48-21 at 1.) Again, finding for the City would require not "liberal construction," but rather a wholesale rewriting of the language that the Parties employed.

## C. Remaining Issues

Having determined the appropriate scope of the Street and Sidewalk Bonds and the Stormwater Maintenance Bonds, the Court next

---

[13] The City also notes, in support of its position, that "[t]he penal sum of each of the [Stormwater Maintenance] [B]onds is the same dollar figure as the bond/security amount required by [paragraph] 4 of the respective [S]tormwater [F]acility [A]greement." (Docket Entry 45 at 18.) Even if the Court looked beyond the language of each Bond to determine the Parties' intent, the fact that "[t]he penal sum of each of the [Stormwater Maintenance] [B]onds is the same dollar figure as the bond/security amount required by [paragraph] 4 of the respective [S]tormwater [F]acility [A]greement" (Docket Entry 45 at 18) does not establish that the Stormwater Maintenance Bonds apply to construction costs where the City has not identified evidence that said Bonds adopted penal sum with construction costs in mind (see Docket Entry 48-48).

must determine:  (1) whether Plaintiffs should receive summary judgment on their contention that the value of the Street and Sidewalk Bonds should be calculated as of one year from the issuance of each respective Street and Sidewalk Bond (see Docket Entry 41, ¶ 1; Docket Entry 43, ¶ 1); (2) whether Selective should receive summary judgment on its argument that the City reduced the penal sum of Selective's Street and Sidewalk Bond for Ravenstone, Phase 2, Section 1 (Bond No. B720376) to $60,000 (see Docket Entry 41, ¶ 3);[14] and (3) whether Developers Surety should receive summary judgment on its argument for reduction of the penal sum of Developers Surety's Bond for Stonehill Estates Phase 3 (Bond No. 593640) by $24,000 (see Docket Entry 46 at 22).[15]

## 1. Time Period for Determining Costs

Plaintiffs' summary judgment motions ask the Court to find that "the cost to complete sidewalks and final asphalt [be] calculated as of one year from the date of each [Street and Sidewalk] Bond." (Docket Entry 41 at 1-2; see also Docket Entry 43 at 1-2.)  This request appears to invoke the language in the Street and Sidewalk Bonds requiring completion of the specified work by

---

[14] Selective's summary judgment motion sought reduction of Bond No. B720376 to $45,000.  (See Docket Entry 41, ¶ 3.)  Selective's supporting brief and reply do not address this matter.  (See Docket Entries 42, 64.)  Developers Surety's reply, however, notes that "Selective's Summary Judgment Motion . . . mistakenly asked that the B720376 Bond be reduced to $45,000.  Selective should have instead asked for a reduction to $60,000."  (Docket Entry 63 at 10 n.9.)

[15] Plaintiffs' Complaint and summary judgment motions do not seek a declaration of amounts due.  (See Docket Entries 1, 41, 43.)

the principal "by (date) Minimum of 1 year" (Docket Entry 42 at 8 (citing "Ex. 12")), but none of their briefing addresses the matter (see Docket Entries 42, 46, 63, 64). Given the lack of attention to this issue, the Court will not enter summary judgment.

## 2. Bond No. B720376

Selective seeks reduction of the penal sum of Bond No. B720376 to $60,000. (See Docket Entry 41, ¶ 3; Docket Entry 63 at 10 n.9.) In terms of argument, Selective's brief merely cross-references Developers Surety's brief. (Docket Entry 42 at 18.) Developers Surety's brief, in turn, argues:

> During the development process, the [Street and Sidewalk] Bond penal sums are often reduced by the City as bonded work is done. The City twice made reductions for two Ravenstone Phases as the sidewalk segments were completed. The bond reductions were communicated to Sherron Roads and [Plaintiffs] by letter, reports, and/or emails from City employees. Thereafter, [Plaintiffs] issued a bond rider or continuation certificate confirming the reductions. These were delivered and accepted by the City. The bond rider/continuation certificate reduced the amount of the two bonds and reduced the premiums paid by Sherron Road.

(Docket Entry 46 at 20 (citation omitted).) The City contends:

> [T]he penal sum of [Bond No. B720376] is $165,000, and no reduction in [B]ond No. B7203076 [sic] was ever effective, as there is no resolution from Durham City Council authorizing the City Manager or any other City employee to reduce [B]ond No. B7203076 [sic] and no City employee with authority from the Durham City Council executed an amendment to the bond as required pursuant to North Carolina law. Additionally, Selective failed to follow its own underwriting guidelines in attempting to reduce the penal sum of this bond. Selective's underwriting guidelines expressly recognize that when a subdivision bond has been issued with a municipality as the obligee, an official city council resolution is required to cancel or reduce the penal sum of a bond and that a letter from an engineer is insufficient.

(Docket Entry 54 at 2-3 (internal citations omitted).)  On this record, the Court cannot resolve this issue as a matter of law.

As evidence that an effective reduction occurred, Developers Surety's brief cites:  (1) the testimony of Mr. Mufalo that he believed he could reduce a bond and that he had never seen a City Council resolution that released or reduced a bond (see Docket Entry 46 at 21); (2) the deposition testimony of the City's expert that bond releases typically occur after completion of improvements and that, in his experience, planning, engineering, or inspections departments typically do the releasing (id.); and (3) the testimony of a former City employee that he had authority to approve stormwater facility construction and that he knew of no requirement of formal City Council approval of either infrastructure or of the release of a construction bond (id.).  None of the evidence establishes, as a matter of law, that a proper reduction occurred, as it reflects only the non-expert witnesses' subjective beliefs and the City's expert stated that he did not "know what the rule -- . . . what the requirements are."  (Docket Entry 48-67 at 23.)[16]

The City, meanwhile, in arguing against the validity of any reduction, merely referred to a previous discussion on the now-moot issue of whether City representatives had authority to bind the

_____

[16] Developers Surety's brief cites pages 68-70 of the deposition testimony of the City's expert, which it references as Exhibit 47.  (See Docket Entry 46 at 21.)  Exhibit 47 omits page 69 of the deposition.  (See Docket Entry 48-67 at 22-23.)  The City's expert's cited testimony - i.e., that he did not "know what the requirements are" - appears at the very top of page 70 (see id. at 23), leaving uncertainty as to the exact context of his statement.

City to a settlement agreement without action from the City Council. (See Docket Entry 54 at 3 (referring to Docket Entry 34 at pages 8-11 for "legal argument regarding limitations on authority to contractually bind the city").) In that memorandum, the City cited N.C. Gen. Stat. § 160-16 and N.C. Gen. Stat. § 159-289(a) (see Docket Entry 34 at 8) - neither of which exist. The Court assumes the City intended to cite to N.C. Gen. Stat. § 160A-16 and N.C. Gen. Stat. § 159-28(a), the former of which requires reduction to writing of all contracts by or on behalf of the City and the latter of which addresses circumstances in which the City incurs an obligation. Neither of those provisions have clear application in this context because the purported reductions appear in writing and the City allegedly released, rather than incurred, an obligation. The City also cites Cabarrus Cnty. v. Systel Bus. Equip. Co., Inc., 171 N.C. App. 423, 614 S.E.2d 596 (2005), disc. review denied, 360 N.C. 61, 621 S.E.2d 177 (2005), which likewise addresses "any county obligation" rather than this situation.

The referenced portion of the City's brief discussing the now-moot settlement agreement issue goes on to argue that "[m]unicipalities are mere instrumentalities of the legislature and, as such, are subject to legislative control, having only such powers and delegated authority as the General Assembly confers upon them" (Docket Entry 34 at 10 (citing Stam v. State, 302 N.C. 357, 360, 275 S.E.2d 439, 441 (1981), and High Point Surplus Co. v. Pleasants, 264 N.C. 650, 654, 142 S.E.2d 697, 700 (1965))), and contends that "[t]he City Manager's cited powers do not include any

-23-

authority to <u>settle claims</u> as part of a lawsuit or otherwise" (<u>id.</u> (emphasis added)). Again, however, such arguments regarding inability to enter into settlement agreements do not clearly apply to the present issue of the ability of City employees to release and/or reduce performance bonds. Even accepting the City's argument that "'parties dealing with governmental organizations are charged with notice of all limitations upon the organizations' authority'" (Docket Entry 34 at 9 (quoting <u>Data Gen. Corp. v. County of Durham</u>, 143 N.C. App. 97, 104, 545 S.E.2d 243, 248 (2001)), the Court lacks conclusive evidence of those limitations.

In sum, a genuine issue of material fact exists as to the authority of City employees to reduce the performance bond (and thus the effectiveness of the purported reduction), precluding entry of summary judgment.

### 3. Reduction of Developers Surety Bond No. 593640

Developers Surety requests reduction of Bond No. 593640, for Stonehill Estates Phase 3, by $24,000 because the City failed to recover $24,000 from an escrow agreement it entered into with a homebuilder (the "Escrow Agreement"). (<u>See</u> Docket Entry 46 at 22; <u>see also</u> Docket Entry 48-66).)[17] To bolster its argument,

---

[17] Only Developers Surety's supporting brief, and not its summary judgment motion itself, argues for the $24,000 reduction of Bond No. 593640. (<u>See</u> Docket Entries 43, 46 at 22.) Subsequently, by way of its reply, Developers Surety states: "Developers [Surety's] Summary Judgment Memorandum mistakenly referred only to the [Street and Sidewalk] Bond for Stonehill Estates, Phase 3 (Developers [Surety] Bond No. 593640). However, there is also [a Stormwater Maintenance] Bond for Stonehill Estates, Phase 3 (Selective Bond No. B720386). The Escrow Agreement refers to all
(continued...)

Developers Surety's supporting brief refers the Court to section V of Selective's supporting brief. (See Docket Entry 46 at 20 n.18 ("*See* law cited in Selective's Memorandum, Section V." (italics in original)).) Section V of Selective's memorandum does not address Bond No. 593640, but addresses a seemingly similar argument with respect to another Bond - i.e., the possible reduction in Selective's Bond No. B720181 due to the City's failure to draw on a letter of credit addressing the "'completion of the construction and/or installation of the wet pond in Phase II of Ravenstone Subdivision.'" (Docket Entry 42 at 17 (citing Docket Entry 48-55).)

Selective's arguments regarding Bond No. B720181 do not clearly apply with equal force to Bond No. 593640. The letter of credit at issue with respect to Bond No. B720181 provides that "the funds are due to [the City] because <u>Sherron Road</u> [] failed to comply with all of its obligations to the City [] as required by the construction drawings for the web pond in Phase II of Ravenstone Subdivision." (Docket Entry 48-55 at 2 (all capitalization style removed and emphasis added).) In contrast, the Escrow Agreement addressing Bond No. 593640 only becomes

---

[17](...continued)
improvements still needed in Phase 3, but only mentions Developers[] [Surety's] Bond. Since the withholding of [certificates of occupancy] security applies to all improvements, one or both [B]onds should be reduced up to a cumulative amount of $24,000." (Docket Entry 63 at 12 n.11.) Because Developers Surety's inclusion of its argument regarding Bond No. 593640 gave the City notice and a full and fair opportunity to respond, the Court will consider its arguments on the matter; however, because argument regarding Bond No. B720386 appeared only in Developers Surety's reply, the Court will not consider that matter.

relevant should <u>Developers Surety</u> decline to release the funds under the Bond itself (or if those funds are inadequate). (<u>See</u> Docket Entry 48-66 at 2-3.) In other words, where the letter of credit appears to have served as additional security for completion of certain infrastructure, the Escrow Agreement appears designed to serve as back-up security to the Bond itself. Because the arguments on which Developers Surety relies regarding Bond No. B720181 do not necessarily counsel in favor of a reduction in Bond No. 593640, the Court declines to enter summary judgment on the issue.

### D. Objections

Finally, Plaintiffs filed two objections to the evidence submitted by the City: (1) Plaintiffs' Objections to Evidence Submitted by Defendant in Support of Defendant's Motion for Summary Judgment (Docket Entry 59); and (2) Plaintiffs' Objections to Evidence Submitted by Defendant in Support of Defendant's Response Briefs (Docket Entry 66). Plaintiffs object to:

- the Affidavit of Marvin G. Williams at ¶¶ 8, 16 (Docket Entry 44-2, ¶¶ 8, 16);

- the Affidavit of Robert N. Joyner, Jr. at ¶¶ 3, 4, 6, 9, 11, 13 and Exhibits A and B (Docket Entry 44-3, ¶¶ 3, 4, 6, 9, 11 and at 7-10);

- the Affidavit of Jacob S. Chandler at ¶¶ 3, 4, 5, 7, 8 and Exhibits A and B (Docket Entry 44-5, ¶¶ 3, 4, 5, 7, 8 and at 6-9);

- the City's Motion for Summary Judgment at ¶¶ 3(a) and 3(b) (Docket Entry 44, ¶ 3);

- David Brown Deposition at 47-48 (lines 22-24 and 1-7), 50 (lines 20-23), and 129-30 (lines 22-24 and 1-2) (Docket Entry 54-2 at 2-4);

- Ashbaugh Deposition at 11 (lines 1-18), 17-18 (lines 14-25 and 6-12), and Exhibit 124 (Docket Entry 51-4 at 2, 8-9); and

- City's Deposition Exhibit 45, bates number DUR01720.

(Docket Entry 59 at 1-3; Docket Entry 66 at 1-3.)

None of the cited evidence has impacted the Court's analysis and therefore the Court denies relief on mootness grounds.

## CONCLUSION

The unambiguous language of the Street and Sidewalk Bonds obligates Plaintiffs solely with respect to the completion of incomplete portions of sidewalks and "final asphalt" - i.e., the final one-inch of asphalt. The unambiguous language of the Stormwater Maintenance Bonds obligates Plaintiffs solely with respect to the operation and maintenance of stormwater facilities.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motions for Summary Judgment (Docket Entries 41, 43) are **GRANTED IN PART** and **DENIED IN PART** in that

(1) the scope of work under Selective's seven Street and Sidewalk Bonds (Bond Nos. B720183, B720187, B720376, B720388, B720185, B720188, and B720377) and Developer Surety's five Street and Sidewalk Bonds (Bond Nos. 580036S, 593636, 593638, 593640, and 593637) is limited to: (i) installing incomplete sidewalk

segments, if any, and (ii) applying the final one-inch layer of asphalt on the streets where not yet applied;

(2) the scope of work under Selective's five Stormwater Maintenance Bonds (Bond Nos. B720181, B7200078, B7200079, B7200080, and B720386) is limited to producing security for costs of operating and maintaining already-constructed and fully converted stormwater facilities and does not include costs to construct, complete, or convert such facilities; and

(3) Plaintiffs' obligations under Bond Nos. B720183 and 580036S are discharged; but

(4) Plaintiffs have failed to show entitlement to judgment as a matter of law as to the value calculation of the Street and Sidewalk Bonds or any reduction of Bond Nos. 593640 and B720376.

**IT IS FURTHER ORDERED** that Defendant City of Durham's Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 (Docket Entry 44) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff's Objections to Evidence Submitted by Defendant in Support of Defendant's Motion for Summary Judgment (Docket Entry 59) and Plaintiffs' Objections to Evidence Submitted by Defendant in Support of Defendant's Response Briefs (Docket Entry 66) are **DENIED AS MOOT.**

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

September 18, 2014